UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| RUBY ANDREWS, et al., | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | Civil No. 05-43-B-W |
| | ) | |
| CITY OF CALAIS, et al., | ) | |
| | ) | |
| Defendant | ) | |

## RECOMMENDED DECISION

This case, involving a mother and son complaint that the Calais Police Department used excessive force in effectuating the son's arrest, is before the court on cross-motions for summary judgment filed by the City of Calais and plaintiffs Ruby and Brian Andrews.  (Docket Nos. 11 & 18.)  Also pending is a motion to dismiss (Docket No. 10) filed by the City of Calais.  Based upon the record before the court, I now recommend that the court **GRANT** the City's motion (Docket No. 11), **DENY** the Andrewses' motion (Docket No. 18), and treat the motion to dismiss (Docket No. 10), which is premised upon the plaintiffs' failure to comply with their discovery obligations, as **MOOT**.

## Summary Judgment Standard

The defendant is entitled to summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material if its resolution would "affect the outcome of the suit under the governing law," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and the dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party," id.  With respect to each summary judgment motion, I review the record in the light most favorable to the nonmovants and I indulge all reasonable inferences in their favor. See Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 5 (1st Cir.2000) (emphasis added).

The fact that the Andrewses are pro se plaintiffs does not free them from the pleading burdens, in this case as both movants and nonmovants, set forth in Rule 56.  See Parkinson v. Goord, 116 F.Supp.2d 390, 393 (W.D.N.Y.2000) ("[P]roceeding pro se does not otherwise relieve a litigant of the usual requirements of summary judgment, and a pro se party's bald assertions, unsupported by evidence, are insufficient to overcome a motion for summary judgment."); see also Sirois v. Prison Health Servs., 233 F.Supp.2d 52, 53-55 (D. Me. 2002). While the Andrewses' complaint may be held to a less stringent pleading standard under Haines v. Kerner, 404 U.S. 519, 520 (1972), their pro se status does not shield them from Rule 56's operative provision under subsection(e) requiring the pleader to "set forth such facts as would be admissible in evidence."

Furthermore, in the District of Maine, to determine whether there is a trialworthy issue, I review the parties' competing summary judgment statements of material fact under the auspices of this District's Local Rule 56, as outlined in Doe v. Solvay Pharms., Inc., 350 F. Supp. 2d 257, 259-60 (D. Me. 2004).  In presenting their motion, the defendants have complied with Federal Rule of Civil Procedure 56 and the District of Maine Local Rules of Civil Procedure 7 and 56. In addition to their summary judgment memorandum the defendants have filed a statement of material facts (Docket No.12) that contains record citations to seven exhibits, including the affidavits of the officers involved in the incident.  Apropos the present motion, the Andrewses filed an "in response to affidavit of Christopher L. Donahue" (Docket No. 19) and their own pro

se motion for summary judgment (Docket No. 18).   Neither pleading complies with subsections (c) and (e) of Local Rule 56.  The response to the defendants' summary judgment statement of facts consists of  an unsigned document refuting each of the supporting affidavits filed by defendants and it is absolutely devoid of any record citation.  (See Docket No. 19).  The Andrewses' pro se motion for summary judgment does not comply with Local Rule 7 nor does it comply with Local Rule 56 (b) and (d). The defendants' summary judgment factual statements have not been properly controverted and, therefore, pursuant to Local Rule 56(f), the material facts set forth by defendants are deemed admitted.

### Statement of Facts

#### *Officer Experience and Training and Standard Operating Procedures*

Michael Milburn is the Chief of Police for the City of Calais, Maine, and has held that position since 1992.  (Def.'s SMF ¶ 1.)  Chief Milburn graduated from the Maine Criminal Justice Academy in 1972 and has been a law enforcement officer employed by the City of Calais since November 1971.  (Id. ¶ 2.)  Chief Milburn is fully certified to function as a law enforcement officer in the State of Maine.  (Id. ¶ 3.)  At all times relevant to this case, Michael Milburn was employed as the Chief of Police and Claude Chabre, Christopher Donahue and Roy Wise were employed as police officers by the City of Calais.  (Id. ¶ 4.)  Officers Chabre, Donahue and Wise are all certified by the Maine Criminal Justice Academy to function as law enforcement officers within the State of Maine and had completed their courses of study and achieved their certifications prior to March 25, 2003.  (Id. ¶ 5.)

Officer Donahue began work as a full time reserve officer with the City of Calais Police Department in September 1999 and graduated from the Maine Criminal Justice Academy

the following year. (Id. ¶ 7.)  Officer Donahue has been employed as a full time police officer since November 2000 and was certified by the State of Maine to function as a law enforcement officer on March 25, 2003.  (Id. ¶ 8.)  At both the Maine Criminal Justice Academy and at the City of Calais Police Department, Officer Donahue received training in proper arrest procedures, including the formulation of probable cause in an arrest situation and the lawful use of force in connection with an arrest. (Id. ¶ 9.)

At all times relevant to this case, Claude Chabre was employed as a police officer by the City of Calais.  (Id. ¶ 10.)  Officer Chabre graduated from the Maine Criminal Justice Academy in 1974 and has been employed as a full time police officer by the City of Calais since 1984.  (Id. ¶ 11.)  At both the Maine Criminal Justice Academy and at the City of Calais Police Department, Officer Chabre received training in appropriate arrest procedures, including the formulation of probable cause to arrest and the lawful use of physical force in connection with an arrest.  (Id. ¶ 12.)

At all times relevant to this case, Roy Wise was employed as a police officer by the City of Calais.  (Id. ¶ 13.)  Officer Wise graduated from the Maine Criminal Justice Academy in 2002 and has worked as a full time police officer in Calais for approximately four years.  (Id. ¶ 14.) On March 25, 2003, Officer Wise was certified by the State of Maine to function in the capacity of a law enforcement officer.  (Id. ¶ 15.)  At both the Maine Criminal Justice Academy and the City of Calais Police Department, Officer Wise received training in proper arrest procedures, including the formulation of probable cause to arrest and the lawful use of reasonable force in connection with an arrest. (Id. ¶ 16.)

The conduct of Calais police officers is governed by state and federal law, as well as the Standard Operating Procedure (SOP) adopted by the Calais Police Department.  (Id. ¶ 17.)

The Calais Police Department has promulgated SOPs to serve as guidelines for its police officers in many areas including, specifically, arrests and the lawful use of force in arrest situations.  (Id. ¶ 18.)  Such SOPs were in effect prior to March 25, 2003, and Calais police officers received training regarding these SOPs prior to that date.  (Id. ¶ 19.)  Arrests and the lawful use of force by Calais police officers are covered in Calais Police Department's SOP Manual.  (Id. ¶ 20.)  Policies regarding use of force are mandated by state law and the City of Calais Police Department was fully compliant with that requirement on March 25, 2003.  (Id. ¶ 21.)  Training for Calais police officers is comprehensive and ongoing.  (Id. ¶ 22.)

The City of Calais, during Michael Milburn's approximately thirty-four years of employment as a Calais police officer, and including his tenure as Chief of Police, has not had a history of citizen complaints regarding unlawful arrests and/or excessive use of force in connection with arrests that would provide notice of any deficiency in the training and/or supervision of Calais police officers.  (Id. ¶ 23.)  The officers involved in the arrest of Brian Andrews on March 25, 2003, do not have a history of complaints about their use of excessive force that would provide the police department's administration notice of deficiencies in their training, their understanding of the laws and procedures governing use of force, or their ability and willingness to conform their conduct with such laws and procedures in accordance with their training.  (Id. ¶ 24.)  As their supervisor, Chief Milburn has also observed nothing in the way Officers Donahue, Wise, and Chabre carry out their job responsibilities that disclosed any such deficiencies.  (Id. ¶ 25.)

### *The Pre-Arrest Interactions*

On March 25, 2003, at approximately 10:55 p.m. Officer Donahue came upon a white pickup truck that had been driven into a snow bank on Union Street in Calais.  (Id. ¶ 26.) Officer

Donahue knew the pickup truck belonged to Brian Andrews, who lived on Garfield Street, just around the corner from the scene of the accident.  (Id. ¶ 27.)  The vehicle was still warm and it was apparent to Officer Donahue that the vehicle had gone off the road just a short time before he came upon the scene.  (Id. ¶ 28.)  Officer Donahue asked Officer Chabre to check the truck while Officer Donahue went to the residence of Brian Andrews on Garfield Street, a very short distance from the accident scene.  (Id. ¶ 29.)

At approximately 11:00 p.m. on March 25, 2003, Officer Chabre was advised that Officer Donahue had come across a single car accident on Union Street, near Garfield Street. (Id. ¶ 30.)  Officer Donahue advised Officer Chabre that he knew the owner of the vehicle and was going to check at the residence of the owner's mother to see if he was there.  (Id. ¶ 31.) While Officer Donahue went to the Andrews residence, which was just around the corner from the accident scene, Officer Chabre went to the accident scene and checked out the pickup truck that was in the snow bank.  (Id. ¶ 32.)  The vehicle was still warm and it was obvious this accident had taken place a very short time before Officer Chabre's arrival.  (Id. ¶ 33.)

When Officer Donahue arrived at the residence, two individuals, Ralph and Melissa Manza, were standing at the front door and being let into the house by Brian's mother, Ruby Andrews.  (Id. ¶ 34.)  Ruby Andrews also voluntarily allowed Officer Donahue to come in, and he asked to speak with Brian.  (Id. ¶ 35.)  Ruby indicated that Brian was in his bedroom and she yelled for him.  (Id. ¶ 36.)  Ralph Manza left shortly after Officer Donahue arrived, but his wife Melissa stayed at the Andrews residence.  (Id. ¶ 37.)  Officer Donahue only entered the residence far enough to cross the threshold and never left the immediate entryway while awaiting Brian Andrews.  (Id. ¶ 38.)  Officer Donahue asked Ruby Andrews how long Brian had been home, and she advised that he had not been home for long, and also stated that he had been

6

dropped off at the residence earlier by someone.  (Id. ¶ 39.)  Ruby Andrews further stated that she then heard tires squealing outside her residence as Brian's pickup truck, which had been parked outside, sped away, and that Brian walked into the house a short time afterward.  (Id. ¶ 40.)  It appeared to Officer Donahue that Brian Andrews had left in his truck after being dropped off at home by someone, but was only able to drive a short distance before going off the road and getting his truck stuck in a snow bank.  (Id. ¶ 41.)

When Brian Andrews came down the hallway from his bedroom, he was staggering and very unsteady on his feet.  (Id. ¶ 42.)  As Brian Andrews spoke to Officer Donahue he swayed back and forth.  (Id. ¶ 43.)  Brian Andrews was in his stocking feet and Officer Donahue asked him to put some shoes on so they could step outside and talk.  (Id. ¶ 44.)  Officer Donahue asked Brian Andrews if the work boots on the floor by the front door belonged to him and Brian replied that they did.  (Id. ¶ 45.)  Officer Donahue looked at the bottom of the shoes and they were very wet, indicating that they had been outside a short time before.  (Id. ¶ 46.)

At approximately 11:00 p.m., Officer Chabre asked Officer Wise to go to the residence at 20 Garfield Street to provide backup support to Officer Donahue.  (Id. ¶ 47.)  As Brian Andrews was putting on his shoes, Officer Wise came to the scene, and Officer Donahue requested that Officer Wise interview Brian while Officer Donahue attempted a track with his K-9.  (Id. ¶ 48.)  Officer Donahue had asked Brian Andrews how his truck came to be in the snow bank around the corner from his house and he simply indicated that he did not know.  (Id. ¶ 49.)  Officer Donahue was using his K-9 to track from the accident scene to the Andrews residence, which was only a short distance away, as part of determining whether probable cause existed to arrest Brian Andrews for operating the motor vehicle while under the influence of alcohol.  (Id. ¶ 50.)

As Officer Chabre was examining the truck, another vehicle, driven by Jessica Drake, pulled up.  (Id. ¶ 51.)  Two men, Ralph Manza and Neal Bohanon, got out of the truck and spoke to Officer Chabre.  (Id. ¶ 52.)  Mr. Manza indicated that he had received a call from Ruby Andrews looking for her son Brian.  Ruby Andrews told Manza that someone had dropped Brian off at the residence, she then heard tires screeching as Brian's truck -- which was parked at the residence -- was driven away, and she presumed Brian was driving it.  (Id. ¶ 53.)  As Mr. Manza was driving to the Andrews residence from his home to speak with Ruby Andrews after her phone call to him, he came upon Brian's truck off the road and stuck in the snow bank.  (Id. ¶ 54.)  No one was in the vehicle and the keys were gone.  (Id. ¶ 55.)  Mr. Manza told Officer Chabre that when he arrived at the Andrews house and spoke with Ruby, she indicated that she already knew the truck was in the snow bank and handed him the keys to Brian's truck, asking if he could try to get it out of the snow bank.  (Id. ¶ 56.)  Mr. Manza then went to see if he could find some help and had found Neal Bohanon and Jessica Drake who agreed to assist him.  (Id. ¶ 57.)  Officer Chabre asked the three individuals if they would provide him written statements about their knowledge of Brian Andrews's movements in the period preceding this accident and Ruby Andrews's statements to them and they agreed to do so.  (Id. ¶ 58.)

When Officer Donahue arrived back at the truck, Officer Chabre was there with Neal Bohanon and Ralph Manza.  (Id. ¶ 59.)  Neal Bohanon advised Officer Donahue that Brian had been dropped off a short time earlier at the Garfield Street residence as a passenger in Neal's vehicle.  (Id. ¶ 60.)  Officer Donahue asked Neal Bohanon if Brian's truck was at his home when Neal dropped Brian off there and he replied that the truck was there.  (Id. ¶ 61.) Officer Donahue had his K-9 smell the driver's side of the pickup truck and commanded him to follow the scent. (Id. ¶ 62.)  Officer Donahue's K-9 tracked the scent down to Union Street and then onto Garfield

Street to the Andrews residence.  (Id. ¶ 63.)  When Officer Donahue's dog went up to the front porch where Brian Andrews and Officer Wise were standing, the dog indicated that Brian Andrews had left the scent from the accident scene that he had been tracking.  (Id. ¶ 64.)

At this point, Brian Andrews's speech was labored and very slurred and his eyes were red and bloodshot.  (Id. ¶ 65.)  When Officer Wise tried to interview Brian, he was slurring his speech and was badly off balance the entire time Officer Wise was talking to him.  (Id. ¶ 66.)  Officer Wise could smell a strong odor of liquor coming from Brian's mouth.  (Id. ¶ 67.)  Brian kept leaning in to talk to Officer Wise and losing his balance, and Officer Wise had to keep backing away from Brian to keep a safe distance from him.  (Id. ¶ 68.)  Brian admitted to having had a couple of drinks earlier, but advised Officer Wise he had stopped drinking by 6:00 p.m.  (Id. ¶ 69.)  Brian also told Officer Wise that he had loaned his truck to a friend a couple days earlier and hadn't seen it since.  (Id. ¶ 70.)  The information about loaning his truck conflicted with information provided by his mother, Ruby Andrews, who stated that Brian's truck was in the driveway of the residence until it had sped away shortly before the officers' arrival at the scene.  (Id. ¶ 71.)  A short time later, according to Ruby, Brian came home on foot.  (Id. ¶ 72.)  Officer Donahue arrived just a few minutes after Brian got home.  (Id. ¶ 73.)  Melissa Manza, who was also at the Andrews residence, stated that Brian had been with her and her husband earlier but that he had left with Neal Bohanon who had later dropped him off at the Garfield Street residence.  (Id. ¶ 74.)

Based on the information Officer Wise was receiving, he believed that Brian had been dropped off at his residence a short time earlier, but instead of going inside, had gotten into his truck and driven off, something that was observed by his mother.  (Id. ¶ 75.)  Brian apparently only made it a short distance around the corner of the intersection of Garfield and Union Streets,

before driving off the road.  (Id. ¶ 76.)  Brian then walked back to his house, with Officer Donahue arriving at the residence a few minutes after him.  (Id. ¶ 77.)  Officer Donahue returned to the residence with his K-9, having followed a scent trail from the scene of the accident to the porch of the Andrews residence.  (Id. ¶ 78.)  Officer Donahue's K-9 jumped repeatedly on Brian as Officer Wise stood on the porch with him, indicating that Brian was the source of the scent the K-9 had followed from the accident scene.  (Id. ¶ 79.)  Based on Officer Donahue's training and experience as a K-9 officer, he believed that Brian was the last person sitting in the driver's seat of his truck when it went off the road on Union Street, and that Brian had then walked the short distance from the scene of the accident to his residence on Garfield Street.  (Id. ¶ 80.)

Meanwhile, Officer Chabre had spoken to Neal Bohanon, Ralph Manza, and Jessica Drake, and ultimately got written statements from them in which they repeated the information they had provided to Officer Chabre.  (Id. ¶ 81.)  The information provided by these individuals supported the officers' belief that Brian Andrews had been dropped off at his residence, and had gotten into his truck which was parked there and driven off, squealing his tires as he did so.  (Id. ¶ 82.)  Brian Andrews's mother, Ruby, looked out the window when she first heard him being dropped off and then saw his truck speed off.  (Id. ¶ 83.)  The Manzas had come to the house to speak with Ruby after seeing Brian's truck off the road in a snow bank and were arriving to speak with Ruby just as Officer Donahue was arriving, with all of them getting to the residence a very short time after the accident had occurred.  (Id. ¶ 84.)  Brian had apparently walked home from the accident scene between the time Ruby called Ralph Manza and Manza's subsequent arrival at the Andrews residence a few minutes later.  (Id. ¶ 85.)  Brian had apparently told his mother about the accident and left the keys with her before heading to his bedroom.  (Id. ¶ 86.)  Officer Donahue conveyed to Officer Chabre, who was the senior officer on the scene, the things

10

he had been told by Ruby and Brian Andrews, and the results of Officer Donahue's track with his K-9 from the scene of the accident to Brian standing on the porch of the Andrews residence on Garfield Street.  (Id. ¶ 87.)

Based on all the information Officer Chabre had received, the most likely scenario seemed to be that Brian had been dropped off at his residence a short time earlier by Ms. Drake and Mr. Bohanon, but instead of going into the residence got into his truck which was parked there and drove away, his mother witnessed the truck speed away and heard its tires screeching. (Id. ¶ 88.)  Brian did not get very far, however, because just around the corner from his residence he lost control of the vehicle and went off the road into a snow bank.  (Id. ¶ 89.) Upon seeing her son's vehicle speed away, and believing him to be the person driving it, Ruby Andrews called Ralph Manza to inquire whether Brian was with him and upon learning that he was not, asked Mr. Manza to go looking for Brian, whom she believed to be driving his pickup truck somewhere in town.  (Id. ¶ 90.)  Mr. Manza found the truck in a snow bank and then went to the Andrews residence to speak with Ruby.  (Id. ¶ 91.)  Between the initial phone call from Ruby to Mr. Manza and Mr. Manza's subsequent arrival at the Andrews residence, Brian had returned to the residence on foot and had apparently admitted to his mother that he had lost control of his vehicle and left it in a snow bank, as she told Mr. Manza that she already knew about the truck being stuck when he told her he had found it stuck in the snow bank.  (Id. ¶ 92.)  Ruby also had the keys to Brian's truck, and requested that Mr. Manza try to get it out of the snow bank.  (Id. ¶ 93.)  Brian was clearly intoxicated and had been operating his vehicle only a few minutes before Officer Donahue's arrival shortly after the accident.  (Id. ¶ 94.)

### *The Arrest*

Based on all of the information Officer Chabre received, he believed that probable cause existed to arrest Brian Andrews and charge him with operating a motor vehicle while under the influence of alcohol.  (Id. ¶ 95.)  Officer Chabre advised Officers Wise and Donahue of his view and requested they take Brian into custody and charge him with OUI.  (Id. ¶ 96.)  Brian was very intoxicated upon Officer Donahue's arrival at the Andrews residence, only a few minutes after Brian's vehicle had been driven into a snow bank around the corner from his house.  (Id. ¶ 97.)  When interviewed by Officer Wise, Brian said he had not had anything to drink since 6:00 p.m., and was not claiming that he had been drinking after the accident but before Officer Donahue arrived.  (Id. ¶ 98.)  Officer Donahue concluded that the level of intoxication he observed only minutes after Brian's vehicle operation must have been the condition he was in only a few minutes earlier when the accident occurred.  (Id. ¶ 99.)  Based on all of the above information, Officer Donahue believed that probable cause existed to arrest Brian for the crime of operating under the influence and Officer Donahue was advised by Officer Chabre to arrest Brian.  (Id. ¶ 100.)

Officer Wise was speaking to Brian on the porch of the Andrews residence when Officer Chabre indicated that Brian should be arrested.  (Id. ¶ 101.)  Officer Wise advised Brian that he was under arrest for OUI and placed handcuffs on him.  (Id. ¶¶ 102, 104.)  After Officer Wise placed the handcuffs on Brian Andrews he became combative and refused to allow Officer Wise to do a pat down search of him.  (Id. ¶ 103.)  Officer Wise attempted to do a pat down search on him at which point Brian immediately became combative and Officer Wise took him down and laid him on the porch so he could be searched.  (Id. ¶ 104.)  Officer Wise was required to place Brian on the ground in order to search him.  (Id. ¶ 105.)  Brian was not slammed to the ground,

but was laid down on the deck, with his hands cuffed behind him.  (Id. ¶ 106.)  During the time

Officer Wise was attempting to search him, Brian was taunting Officer Donahue's K-9 and was

being verbally abusive to Officer Wise.  (Id. ¶ 107.)  Officer Wise was able to finish the brief pat

down search and transported Brian to the Calais police station.  (Id. ¶ 108.)  In Officer

Donahue's parting discussion with Ruby Andrews, she confirmed that Brian's truck had been at

their residence earlier in the evening.  (Id. ¶ 109.)  Brian had originally told Officer Donahue that

he had not seen his truck for several days, because he had loaned it to a friend.  (Id. ¶ 110.)  Ruby

Andrews also advised Officer Donahue that she heard tires squealing as the truck left her

residence and that Brian returned to the house a short time later.  (Id. ¶ 111.)

Officer Wise transported Brian Andrews to the police station while Officer Chabre took

statements from Jessica Drake, Ralph Manza and Neal Bohanon.  (Id. ¶ 112.)  Officer Wise

began to remove Brian's handcuffs when they arrived at the station, but he became so combative

that Officer Wise had to wait until Officers Chabre and Donahue arrived before he could take

them off.  (Id. ¶ 113.)  As Officer Donahue was finishing up his discussion with Ruby Andrews,

dispatcher Deborah Kelly requested assistance at the police station, where Brian had continued to

be combative with Officer Wise.  (Id. ¶ 114.)  Officer Chabre heard the call from Dispatch

requesting assistance at the police station, where Officer Wise was having difficulty dealing with

Brian who was being both physically and verbally combative.  (Id. ¶ 115.)  When Officers

Chabre and Donahue arrived at the police station, Brian was being verbally abusive toward

Officer Wise, swearing at him and taunting him to fight.  (Id. ¶ 116.)  Because Brian was

combative and uncooperative, Officer Wise placed him in a cell after he refused to take an

intoxilizer test.  (Id. ¶ 117.)  Officer Wise tried to read Brian the Implied Consent Form but he

screamed at Officer Wise the whole time as he was reading the form and also attempted to

urinate on Officer Wise.  (Id. ¶ 118.)  When Officer Wise moved away so that Brian could not

urinate on him, he spit in Officer Wise's face and as a result received a summons for assault.  (Id.

¶ 119.)  Officers Chabre and Donahue had to restrain Brian so that he could be searched.  (Id. ¶

120.)  Brian stated that he would take an intoxilizer, but ultimately refused to do so.  (Id. ¶ 121.)

Throughout the entire time, Brian was verbally abusive to Officer Wise, swearing at him and

taunting him to fight.  (Id. ¶ 122.)

       Officer Chabre has known Brian Andrews for many years and has been involved in

several previous arrests of him.  (Id. ¶ 123.)  In every arrest in which Officer Chabre has been

involved, Brian has been physically combative and fought with officers trying to arrest him.  (Id.

¶ 124.)  Brian's conduct on March 25, 2003, was consistent with every other time Officer Chabre

has seen him being arrested.  (Id. ¶ 125.)  Officer Chabre also observed Brian's attempt to urinate

on Officer Wise and then saw him spit in his face at which time he advised Officer Wise to also

charge Brian with assault for spitting on him.  (Id. ¶ 126.)

       Brian Andrews was charged with operating under the influence and also with assault for

spitting in Officer Wise's face after failing in his attempt to urinate on Officer Wise.  (Id. ¶ 127.)

Ultimately, the District Attorney's Office dismissed the OUI charge and Brian was convicted of

disorderly conduct, which was reduced from the original assault charge.  (Id. ¶ 128.)

       At no time did Officer Donahue use any force on Brian other than a minimal amount to

restrain him so that Officer Wise could search him at the police station.  (Id. ¶ 129.)  Officer

Donahue did not use any more force than was reasonably necessary, and he did not use any more

force than he thought was reasonably necessary.  (Id. ¶ 130.)  At no time did Officer Chabre use

any force against Brian other than a minimal amount necessary to help restrain him for searching

and for the officer's own safety.  (Id. ¶ 131.)  At no time did Officer Chabre use any force against

Brian other than what Officer Chabre believed to be reasonably necessary to allow Brian to be searched incident to his arrest and for Officer Chabre's own safety.  (Id. ¶ 132.)  At no time did Officer Wise use any physical force on Brian other than what was reasonably necessary to take him into custody, to search him, and for Officer Wise's own safety.  (Id. ¶ 133.)  Brian was uncooperative and physically combative from the moment he was placed under arrest until he was placed in a cell at the police station.  (Id. ¶ 134.)  Even at that point, Brian spat in Officer Wise's face and attempted to urinate on him.  (Id. ¶ 135.)  At no time did Officer Wise use any physical force beyond that which he believed was reasonably necessary to effect Brian's arrest and to protect himself.  (Id. ¶ 136.) Officer Donahue did not observe any use of force by Officers Wise or Chabre that was beyond the minimal amount that was reasonably necessary to effect Brian's arrest and for their own self-protection.  (Id. ¶ 137.)  Officer Chabre did not observe any use of force by Officers Wise or Donahue that was beyond the minimal amount that was reasonably necessary to effect Brian's arrest and for their own self protection.  (Id. ¶ 138.)  At no time did Officer Wise observe Officers Chabre or Donahue use any physical force against Brian other than the minimal amount necessary to help him restrain Brian so he could be searched and finally placed in a cell.  (Id. ¶ 139.)

### City Liability Insurance

The City of Calais and the Calais Police Department have no policy of liability insurance that would provide coverage for the claims raised by the Andrewses in their lawsuit.  (Id. ¶ 140.) At all times relevant to the Andrewses' claims the City of Calais, Calais Police Department, and their employees were provided coverage for such claims only through the City's membership in the Maine Municipal Association Property & Casualty Pool, a self-insured municipal pool.  (Id. ¶ 141.)  The Pool agreement provides coverage for state law claims only to the extent the City

and its employees are not immune under applicable state law.  (Id. ¶ 142.)  The City of Calais,

the Calais Police Department and the individual officer defendants in the above referenced action

received no written notice of intent to sue from Ruby or Brian Andrews within one-hundred-

eighty days of the events of March 25, 2003.  (Id. ¶ 143.)  The first notice that was received by

the municipal defendants occurred when Ruby and Brian Andrews filed their Complaint in

federal court.  (Id. ¶ 144.).

**Discussion**

*1. The Andrewses' <u>Pro Se</u> Motion for Summary Judgment*

On October 17, 2005, almost one month after the September 27, 2005, dispositive motion

deadline the Andrewses elected to file a motion for summary judgment. (Docket No. 18.)  It was

not accompanied by a memorandum of law or a statement of material facts.  What did

accompany the motion was their timely response to defendants' earlier motion for summary

judgment.  As discussed below, that document was unsigned and did not contain a memorandum

of law, a response to the numbered paragraphs of defendants' statement of material facts, or any

record citations and exhibits of evidentiary quality.  Predictably the defendants' response to this

motion cited its numerous failings and requested summary denial of the motion.  (Docket No.

22.)

With an equally predictable certainty, plaintiffs replied to this response by belatedly

attempting to cure their pleading deficiencies.  Five pleadings were filed with respect to the

plaintiffs' – and <u>not</u> the defendants' --  motion for summary judgment.  The reply (Docket No.

25) consists of yet another narrative version of the events of the night in question.  The statement

of fact (Docket No. 26) consists of a 224 paragraph statement of fact supported by citation to the

appropriate paragraphs of the Ruby and Brian Andrews affidavits (Docket Nos. 27 & 28) and,

16

finally, a pleading providing "information essential to this case" (Docket No. 29), consisting of three newspaper articles and a copy of a state search warrant, none of which are cited as record evidence in the statement of facts.  Of course, under the rules of pleading the defendants are prohibited from responding to this reply.  (Although this concept of a discrete sequence of pleadings seems foreign to the Andrewses because apparently they believe the nonmovant is authorized to file a surreply without leave of court as demonstrated by the Andrewses' pleading at Docket No. 24, their surreply to reply to response to motion to dismiss.)

As plaintiffs in this case, the Andrewses would be unlikely to prevail on their motion even if it were in the proper procedural posture.  As the party with the ultimate burden of proof at trial, commonly the best a plaintiff can hope for at this juncture is that there will be genuine disputes regarding issues of material fact that will allow the case to proceed to trial.  If I were to seriously entertain plaintiffs' motion for summary judgment at this point in time I would have to totally abrogate our local rules governing summary judgment practice and disregard my own scheduling order.  This court has previously said that although it will read a pro se parties supporting papers liberally, those who do proceed pro se in this court are "held generally to the same standards as an attorney."  Doe v. Solavay, 350 F.Supp2d at 260 n.3.

Furthermore, the affidavits filed in support of the reply to their own motion for summary judgment cannot be allowed to substitute for a properly supported response to defendants' statement of material facts.  The affidavits themselves are simply raw material that might be used to fashion an admission, denial, or qualification to each of the defendants' original 144 paragraph statement of fact that forms the basis of this summary judgment record.  The relationship between that document and the two affidavits is far from obvious and this is not a

case where the court, liberally construing the documents, can even begin to divine which of the 144 paragraphs have been denied or qualified in a meaningful way.

This motion for summary judgment should be summarily denied.

### 2. Brian Andrews's Federal Constitutional Claims

Brian Andrews claims that his constitutional rights under the Fourth Amendment to the United States Constitution were violated in two respects. He was arrested without probable cause and the arresting officers employed excessive force in effectuating the arrest. Even though Andrews has fallen far short in responding to defendants' motion vis-à-vis these claims, I address the merits. Arrests made without probable cause can give rise to a 42 U.S.C. § 1983 claim. Alexis v. McDonald's Rests. Mass., Inc., 67 F.3d 341, 349 (1st Cir. 1995) ("The Fourth Amendment guaranty against unreasonable seizures of the person requires that arrests be based on probable cause."). It is also true that, "[a]n arrest is lawful if it was supported by probable cause." McDermott v. Town of Windham, 204 F. Supp 2d. 54, 61 (D. Me. 2002) (citing Beck v. Ohio, 379 U.S. 89, 91 (1964)). Probable cause,

> exists "when the arresting officer, acting upon apparently trustworthy information, reasonably concludes that a crime has been (or is about to be) committed and that the putative arrestee likely is one of the perpetrators." Acosta [v. Ames Dep't Stores, Inc.], 386 F.3d [5,] 9 [(1st Cir. 2004)]. The test is objective in nature, United States v. Figueroa, 818 F.2d 1020, 1023 (1st Cir.1987), and the proof must be such as to give rise to a reasonable likelihood that the putative arrestee committed the suspected crime, Valente v. Wallace, 332 F.3d 30, 32 (1st Cir.2003).

Cox v. Hainey, 391 F.3d 25, 31 (1st Cir. 2004). See also Devenpeck v. Alford, 543 U.S. 146, __, 125 S. Ct. 588, 593 (2004) ("[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed. See United States v. Watson, 423 U.S. 411, 417-24 (1976); Brinegar v. United States, 338 U.S. 160, 175-76 (1949). Whether probable cause exists depends upon the

reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest.  Maryland v. Pringle, 540 U.S. 366, 371 (2003).").

"Whether an officer is authorized to make an arrest ordinarily depends, in the first instance, on state law."  Michigan v. DeFillippo, 443 U.S. 31, 36 (1979); accord Williams v. Jaglowski, 269 F.3d 778, 781 (7th Cir. 2001) (quoting DeFillippo).  Defendants claim they had probable cause to believe that Andrews had operated a motor vehicle while intoxicated, resulting in a single car accident.  Maine law authorizes the arrest of such a person without a warrant if the arrest occurs within a period following the offense reasonably likely to result in obtaining probative evidence of blood-alcohol level.  See 29-A M.R.S.A. § 2411(4).  Taken in the light most favorable to Brian Andrews, the party asserting the injury, the undisputed facts alleged in this summary judgment record simply do not support a conclusion that the arrest was without probable cause.  For, framed in light of the Maine law cited above, it is undisputed that the officers had reliable information that Brian Andrews's vehicle had been very recently operated, that Andrews was himself the operator, and that Andrews appeared to be clearly under the influence of intoxicating liquors.  The probable cause evidence included not only the officers' own observations, but the statements of witness and the scent track followed by the canine.  The evidence presented a reasonable basis to believe Andrews had been operating the vehicle shortly prior to the arrest and that he was intoxicated.

Andrews's second constitutional claim is that at the time of the arrest one or more officers used excessive force against him.  With the right to arrest comes the right to use a reasonable degree of force to effect that arrest.  See generally Graham v. Connor, 490 U.S. 386 (1989).  Although the officers raise the defense, there is no need to undertake a qualified immunity analysis in this case, because the only material in the record of evidentiary quality is the officers'

affidavits wherein they unanimously observe that the only force used was that force reasonably necessary to effectuate the arrest and conduct a search of Andrews prior to placing him in a cell. Brian and Ruby Andrews have not submitted with respect to their opposition to the defendants' motion for summary judgment any affidavits, depositions, or other material of evidentiary quality.  The summary judgment record is devoid of any evidence of excessive force by any officer.[1]

### 3.  *Federal claims against Calais premised on municipal liability*

The Andrewses' federal claims against the City of Calais/Calais Police Department or any properly named municipal defendant will only be successful if that entity was responsible for an unconstitutional municipal custom or policy.  Monell v. Dept. of Soc. Servs. City N.Y., 436 U.S. 658, 690 (1978) ("Local governing bodies ... can be sued directly under [42 U.S.C.] § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."(footnote omitted); id. at 690-91 ("[A]lthough the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other § 1983 'person,' by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom

---

[1]        The defendants have submitted both Brian and Ruby Andrews' Answers to Interrogatories as Exhibits Numbers 5 & 6 to their motion to dismiss, but those answers are not cross-referenced in the Andrewses' summary judgment response.  Furthermore the interrogatory answer only pertains to officers Wise and Donohue and does nothing to further any claim in this record except for the excessive force claim against those two officers.  In any event, nothing in either affidavit negates the probable cause determination made by the officers.  As to the claim of excessive force, Brian Andrews does state under penalty of perjury that in his opinion he was subjected to an unreasonable degree of force on the porch of his home at the time of the initial arrest.  I have addressed the separate affidavits tardily filed by Ruby and Brian Andrews (Docket Nos. 27 & 28) in my discussion of their motion for summary judgment and why it fails to comply with the Local Rule.  I do not believe that the interrogatory answers provided by Brian Andrews have in any manner been incorporated into this summary judgment record as I have disregarded all of the allegations and counter allegations raised by the Rule 37 motion to dismiss.

20

has not received formal approval through the body's official decisionmaking channels."); <u>Burrell v. Hampshire County</u>, 307 F.3d 1, 2 (1st Cir. 2002) (observing that suit against an official in an official capacity "is tantamount to a suit against the entity of which the official is an agent" and there must be a claim "that the entity followed a policy or custom" that was unconstitutional). With respect to their claims against these municipal defendants, the plaintiffs must ultimately establish two elements:

> First, the custom or practice must be attributable to the municipality, <u>i.e.,</u> it must be "so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice." <u>Bordanaro v. McLeod</u>, 871 F.2d 1151, 1156 (1st Cir.1989). Second, the custom must have been the cause of and "the moving force" behind the deprivation of constitutional rights. <u>Id</u>. at 1157.

<u>Miller v. Kennebec County</u>, 219 F.3d 8, 12 (1st Cir. 2000).

In the present case the summary judgment record establishes that the City of Calais trains its officers according to state standards and has never received any notice of deficiencies in that training.  There is no evidence that municipal policymaking officials had any knowledge, actual or constructive, of a police department policy condoning either arrests without probable cause or excessive force in effectuating arrests.  Apparently attempting to belatedly fill this gap in their pleadings, the Andrewses have filed two exhibits, without explanation, at Docket No. 29.  In addition to being procedurally inappropriate and inadmissible as hearsay, the two exhibits do not support a claim against the city.   Exhibit A consists of two newspaper articles pertaining to Roy Wise's involvement in an incident investigated by the State Police on July 15 of an unknown year and a January 20, 2005, newspaper article relating to the settlement of a racial lawsuit involving Wise and alleging his use of unlawful force during that arrest, and  this article suggests that the earlier article related to an incident that occurred in 2004.  Exhibit B is a state search warrant issued in February 2003 for, <u>inter alia</u>, the white van owned by Brian Andrews.  In an

unsigned addendum to the search warrant, it is stated in conclusory fashion that the events of March 25, 2003, "took place because of this warrant."

Presumably if this information were in a legally admissible format, the Andrewses would argue that it creates a dispute of fact concerning Chief Milburn's assertion that he had no notice of the deficiencies in the performance of any of his officers.  Apparently the Andrewses maintain that at least as to Officer Wise, the Chief should have been on notice on March 25, 2003, that he had a history of complaints regarding his excessive use of force, thereby contesting the assertion made by Chief Milburn in ¶ 4 of his affidavit.  However, at best, this information might possibly create an issue of fact vis-à-vis Chief Milburn's supervisory liability over one "rogue cop."  Chief Milburn has not even been sued in this case.  The newspaper articles do not implicate the city's responsibility for an incident occurring on March 25, 2003, pursuant to a municipal policy or custom such as would give rise to municipal liability.

### 4.  State Law Claims

Both plaintiffs, but particularly Ruby Andrews, state claims pursuant to Maine state tort law for infliction of emotional distress and other claimed injuries.  The municipal entities and the individual defendants are both immune from liability pursuant to the provisions of the Maine Tort Claims Act as applied to the facts of this case.

Section 8103(1) of Maine Revised Statute Annotated title 14, provides: "Except as otherwise expressly provided by statute, all governmental entities shall be immune from suit on any and all tort claims seeking recovery of damages. When immunity is removed by this chapter, any claim for damages shall be brought in accordance with the terms of this chapter."  14 M.R.S.A. § 8103(1).  There is no factual dispute to support the conclusion that the exceptions to immunity of 14 M.R.S.A. § 8104-A are applicable.

The defendants' motion also seeks summary judgment under the personal immunity for employees provision of the Maine Tort Claims Act.  It provides, as relevant:

> **Immunity.** Notwithstanding any liability that may have existed at common law, employees of governmental entities shall be absolutely immune from personal civil liability for the following:
>
> ....
>
> **C.** Performing or failing to perform any discretionary function or duty, whether or not the discretion is abused; and whether or not any statute, charter, ordinance, order, resolution, rule or resolve under which the discretionary function or duty is performed is valid;
>
> ....
>
> **E.** Any intentional act or omission within the course and scope of employment; provided that such immunity does not exist in any case in which an employee's actions are found to have been in bad faith; or
>
> ...
>
> The absolute immunity provided by paragraph C shall be applicable whenever a discretionary act is reasonably encompassed by the duties of the governmental employee in question, regardless of whether the exercise discretion is specifically authorized by statute, charter, ordinance, order, resolution, rule or resolve and shall be available to all governmental employees, including police officers and governmental employees involved in child welfare cases, who are required to exercise judgment or discretion in performing their official duties.

14 M.R.S.A. § 8111(1). Police officers are generally performing discretionary functions within the meaning of the statute when they make warrantless arrests and use physical force they deem necessary in connection with those arrests. See Comfort v. Town of Pittsfield, 924 F.Supp. 1219, 1236 (D. Me 1996).

However, it really isn't necessary to reach the immunity analysis because the undisputed facts of this record show that the plaintiffs did not file a written notice of claim in compliance with 14 M.R.S.A. § 8107.  This failure to provide the required notice is fatal to any claims arising under state tort law. See Peters v. City of Westbrook, 2001 ME 179, ¶ 5, 787 A.2d 141, 143.  Therefore the Andrewses' claims under state law fail for this reason alone, never mind that

if the notice had been timely filed the defendants would have been able to invoke the previously discussed immunity provisions.

### Conclusion

Based upon the foregoing I now recommend that the court **GRANT** the defendants' motion for summary judgment (Docket No. 11), **DENY** the plaintiffs' cross-motion (Docket No. 18), and treat as **MOOT** the defendants' motion to dismiss (Docket No. 10) the complaint as a sanction under Rule 37, Federal Rules of Civil Procedure.

<u>NOTICE</u>

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within ten (10) days of being served with a copy thereof. A responsive memorandum shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

Dated November 9, 2005